# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

SARAH ANN BERTOLA and )
DALLAS BERTOLA, )
Co-Personal Representatives of the )
Estate of A.M.B., deceased )
and in their own right, )
                       )
           Plaintiffs, )
                       )      C.A. No.: N21C-01-115 FJJ
        v. )
                       )
FISHER-PRICE, INC. and )
MATTEL, INC., )
                       )
           Defendants. )

Submitted: May 5, 2025
Decided: May 8, 2025

## OPINION AND ORDER
*On the Defendants' Motion for Reargument for the Court's Opinion on Defendants' Evidentiary Motions*

*Robert J. Leoni, Esquire,* Shelsby & Leoni, Newark, Delaware and *Alan M. Feldman, Daniel J. Mann,* and *Edward S. Goldis, Esquires*, (Pro Hac Vice) Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig, LLP, Philadelphia, Pennsylvania, *Attorneys for Plaintiffs.*

*Jennifer C. Wasson, Esquire, and Ryan D. Kingshill, Esquire*, Potter Anderson & Corroon, LLP, Wilmington, Delaware, *Steven B. Weisburg, Esquire and Jan E. Dodd* (Pro Hac Vice) Shook, Hardy & Bacon, LLP, Los Angeles, CA, *Attorneys for Defendants.*

**Jones, J.**

## INTRODUCTION

Plaintiffs Sarah Ann Bertola and Dallas Bertola ("Plaintiffs") filed the instant products liability suit against Fisher-Price, Inc. and Mattel, Inc. ("Defendants") in response to the death of Plaintiffs' infant child, A.M.B., while sleeping in Fisher-Price's Rock 'n Play Sleeper ("RnP"). Plaintiffs allege a defect in the RnP caused positional asphyxiation so that A.M.B. could not breath and eventually passed. Defendants filed a number of *Daubert* Motions. This is the Court's Order on these Motions.

## DEFENDANTS' MOTION FOR REARGUMENT

The Court issued its initial Opinion and Order on Defendants' Evidentiary Motions on April 21, 2025.[1] Defendants filed the instant Motion for Reargument on April 28, 2025.[2] Defendants ask the Court to review their *Daubert* Motions without relying on Judge Winston's ruling in *Brown*. They contend, despite the experts being the same, the differing causation theories between the *Bertola* and *Brown* case require separate *Daubert* analyses of those experts. Defendants suggest the Court did not understand this distinction between the cases, and the Court would have understood the distinction if oral argument had been held on the Motions. However, the Court sees the distinction between cases, and saw the distinction without the need

---

[1] Docket Item ("D.I.") 243.
[2] D.I. 244.

2

for oral argument, but finds it does not make a difference to the outcome of the *Daubert* motions. So that there is no doubt, the Court will go through an in-depth analysis of Defendants' *Daubert* Motions.

## MOTION FOR REARGUMENT STANDARD OF REVIEW

Delaware Superior Court Civil Rule 59(e) allows a party to file a motion for reargument with the court and grants the court the power to "determine from the motion and answer whether reargument will be granted."[3] The appropriate circumstance to grant a motion for reargument is when "the Court overlooked a controlling precedent or legal principles, or the Court has misapprehended the law or facts such as would have changed the outcome of the underlying decision."[4] A motion for reargument is not the appropriate tool to raise a new argument.[5] Nor is it the time to rehash arguments previously made and decided by the Court.[6]

## *DAUBERT* STANDARD OF REVIEW

Delaware Rule of Evidence 702 governs the admissibility of expert testimony. Delaware has adopted the holdings in *Daubert v. Merrell Dow Pharmaceuticals Inc.*[7] and *Kumho Tire Co., Ltd. v. Carmichael*[8] to interpret the Delaware Rule.[9] In *Daubert* and *Kumho*, the United States Supreme Court interpreted and explained

---

[3] Del. Super. Ct. Civ. R. 59(e).
[4] *Kennedy v. Invacare, Inc.*, 2006 WL 488590, at *1 (Del. Super. Jan. 31, 2006).
[5] *Aranda v. Phillip Morris USA Inc.*, 183 A.3d 1245, 1255 (Del. 2018).
[6] *Kennedy*, 2006 WL 488590 at *1.
[7] 509 U.S. 579 (1993).
[8] 526 U.S. 137 (1993).
[9] *Bowen v. E.I. DuPont de Nemours & Co., Inc.*, 906 A.2d 787, 794 (Del. 2006) (citing *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 522 (Del. 1999)).

Federal Rule of Evidence 702, which is "substantially similar" to the Delaware Rule.[10]  Delaware Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the witness has applied the principles and methods reliably to the facts of the case.[11]

To be admissible, expert testimony must be "relevant and reliable."[12] To make this determination, the trial judge engages in a five-step analysis.[13] This analysis provides that the trial judge finds that:

> (1) the witness is qualified as an expert by knowledge, skill, experience, training, or education;
> (2) the evidence is relevant;
> (3) the expert's opinion is based on information reasonably relied upon by experts in the particular field;
> (4) the expert testimony will assist the trier of fact to understand the evidence or to determine a fact in issue; and
> (5) the expert testimony will not create unfair prejudice or confuse or mislead the jury.[14]

The burden of establishing that the expert testimony is admissible lies with its proponent by a preponderance of the evidence.[15]  "A strong preference exists" for

---

[10] *Smack-Dixon v. Walmart Inc.*, 2021 WL 3012056 (Del. Super. Ct. Jul. 16, 2021) (citing *Bowen*, 906 A.2d at 794).
[11] D.R.E. 702; *see also Smack-Dixon*, 2021 WL 3012056 (Del. Super. 2021).
[12] *Daubert*, 508 U.S. at 597.
[13] *Smack-Dixon*, 2021 WL 3012056 at *2 (citing *Bowen*, 906 A.2d at 795)).
[14] *Id.*
[15] *Id.*

admitting expert opinions "when they will assist the trier of fact in understanding the relevant facts or the evidence."[16]

Reliable expert testimony is premised on scientific or specialized knowledge which requires the testimony to be grounded in scientific methods and procedures and "supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known."[17]

Many scientific, technical, or specialized fields are not subject to peer review and publication which is why the test of reliability is "flexible." A rigid application of the *Daubert* factors to determine testimonial reliability in every field of expertise is not practical.[18] Even with all the advances of medical science, the practice of medicine remains an art, and a diagnosis in the practice of clinical medicine "is not an exact science."[19]

Again, a gatekeeping judge has "broad latitude" to determine whether an expert's proffered opinion is based upon the "proper factual foundation and sound

---

[16] *Smack-Dixon*, 2021 WL 3012056 at *2 (quoting *Delaware ex. Rel. French v. Card Compliant, LLC,* 2018 WL 4151288, *2 (Del. Super. Ct. Aug. 29, 2018) (quoting *Norman v. All About Women, P.A.*, 193 A.2d 726, 730 (Del. 2018)).

[17] *Daubert*, 509 U.S. at 590.

[18] *Henlopen Hotel v. United Nat'l Ins. Co.*, 2020 WL 233333, at *3 (Del. Super. May 11, 2022).

[19] *State v. McMullen*, 900 A.2d 105, 114 (Del. Super. Ct. 2006). *See also Moore v. Ashland Chem.*, 126 F.3d 679, 688-690 (5th Cir. 1997), *vacated on reh'g en banc*, 151 F.3d 269 (5th Cir. 1998) ("First, the goals of the disciplines of clinical medicine and hard Newtonian science are different. . . .Second, the subject matter and conditions of study are different. . . .Finally, clinical medicine and hard science have marked different methodologies. . . .In sum, hard Newtonian scientific knowledge. . .is knowledge of a particular and limited kind. . . . Although clinical medicine utilizes parts of some hard sciences, clinical medicine and many of its subsidiary fields are not hard sciences. . . . Consequently, the *Daubert* factors, which are hard scientific methods selected from the body of hard scientific knowledge and methodology generally are not appropriate for use in assessing the relevance and reliability of clinical medical testimony"). The Fifth Circuit's discussion of the significant differences between disciplines in "hard science" and clinical medicine still holds true even though the decision in that case was ultimately vacated. *Id.*

5

methodology."[20] This "proper factual foundation" language has been distilled from Delaware Rule 702.[21] To meet the criterion for a "proper factual foundation," an expert's opinion must be based on "facts" and not "suppositions."[22] When applied to a medical expert, a causation opinion is admissible when it's "based on his analysis of the circumstances . . . not mere speculation over the cause."[23] And a proponent need only show by a preponderance of the evidence that her expert's opinions are reliable, not that they are correct.[24] So, this Court's Rule 702 reliability examination must focus on principles and methodology not on the resultant conclusions.[25]

Delaware courts generally recognize that challenges to the "factual basis of an expert opinion go to the credibility of the testimony, not the admissibility, and it is for the opposing party to challenge. . . the expert opinion on cross-examination."[26] "The different depth with which [an expert] pursued particular lines of investigation and the different assumptions they made are readily subject to cross-examination

---

[20] *Russum v. IPM Dev. P'ship LLC*, 2015 WL 2438599, at *2 (Del. Super. May 21, 2015).
[21] *Id.*
[22] *Id.* at 3.
[23] *Norman*, 193 A.2d at 732.
[24] *McMullen*, 900 A.2d at 114 (citing *In Re: Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)).
[25] *Henlopen Hotel*, 2020 WL 233333, at *2 ("At bottom, the Court's examination of an expert's opinion must be solely focused on principles and methodology, not on the conclusions they generate.") (quoting *Tumlinson v. Advanced Micro Devices*, 81 A.3d 1264, 1269 (Del. 2013)).
[26] *Perry v. Berkley*, 996 A.2d 1262, 1271 (Del. 2010). *See also Hodel v. Ikeda*, 2013 WL 226937, at *4 (Del. Super. Ct. Jan. 18, 2013); *Daubert*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (internal citations omitted)); *Russum*, 2015 WL 2438599, at *3.

and to evaluation by the fact finder for credibility and weight."[27]   An expert's testimony will only be excluded in the narrow circumstance where he is shown to have completely neglected the core facts of the case.[28]   And, under Delaware Rule 702, a medical doctor's opinion "based on his own knowledge" and informed by his review of a patient's records may certainly be sufficient to clear the *Daubert/Bowen* reliability threshold.[29]

## EXPERT TESTIMONY REGARDING CONSCIOUS PAIN AND SUFFERING

In their Reargument Motion, Defendants do not oppose the Courts' adoption of Judge Winston's ruling on Defendants' Motion to exclude the conscious pain and suffering testimony of two of Plaintiffs' experts, Darlene Vasbinder-Calhoun and Wayne Ross in *Brown v. Fisher-Price, et. al.*[30]  This Court still finds it is appropriate to defer to and adopt Judge Winston's ruling in that opinion, and, thereby, **DENIES** Defendants' Motion to Exclude Expert Testimony on Conscious Pain and Suffering.

## TESTIMONY OF DENNIS ROSEN

Defendants seek to exclude Plaintiffs' pediatric expert, Dr. Dennis Rosen ("Rosen").[31]   Rosen is a pediatrician whose expertise is in pediatric pulmonology

---

[27] *Henlopen Hotel*, 2020 WL 233333, at *4; *Perry v. Berkley*, 996 A.2d at 1271 (noting cross-examination rather than exclusion can be the proper method of exploring the bases of an expert's opinion and the weight to be ascribed thereto).
[28] *Russum*, 2015 WL 2438599, at *3.
[29] *See e.g.*, *Norman*, 193 A.3d at 731-32.
[30] D.I. 162 ; *see* Order Denying the Exclusion of Conscious Pain and Suffering Expert Testimony, N20C-01-067, D.I. 162 (Dec. 20, 2024).
[31] D.I. 152.

and sleep medicine.[32] Rosen's general causation opinion is that the RnP "places an infant in an anatomical position that is unsafe for unsupervised sleep and directly contradicts the longstanding recommendations of the American Academy of Pediatrics on safe sleep," and "positions an infant in a manner which predisposes them to neck flexion," causing positional asphyxiation. Rosen testifies his opinion to the specific cause of A.M.B.'s death is that the infant "slumped forward with her neck in flexion of at least 20 degrees," which led to "positional obstruction of [her] upper airway passages, was unable to extricate herself from this position, and died as a result of cardiopulmonary arrest."[33] In forming his opinions, Rosen relies on case facts and records,[34] American Academy of Pediatrics ("AAP") Guidelines,[35] as well as studies and other medical literature.[36]

Defendants base their argument on three points: (1) Rosen had "no scientifically reliable basis for any general causation opinion" that the RnP's incline could cause "supine (face up) infants to die from chin-to-chest positional asphyxiation;" (2) Rosen's specific causation opinion is based on guesswork and speculation; and (3) Rosen did not, but should have, conducted a differential diagnosis.[37]

---

[32] D.I. 190, Exhibit ("Ex.") A, Rosen's Expert Report, p.1.
[33] *Id.*, Ex. A. p.18-19.
[34] D.I. 190, Ex. A p.2-4, 17-18.
[35] *Id.* Ex. A p.4-7.
[36] *Id.* Ex. A p.7-13.
[37] *Id.* Ex. A p.2-4.

8

## General Causation

Defendants first argue Rosen may not make opinions about the "mechanics of infant movements" in an RnP because Rosen does not have expertise in biomechanical engineering.[38] Defendants further contend Rosen's reliance on Dr. Mannen's, Plaintiffs' biomechanical engineering expert, is improper because the report is "mere speculation" upon which Rosen "add[s] his own rank speculation on top of."[39] Plaintiffs respond arguing Rosen's medical qualifications permit him to give his general causation opinion and that an engineering background is not required to offer his opinions.[40] Plaintiffs further contend Rosen's opinions were based on an "independent review" from Dr. Mannen's report, but, even if Rosen had relied on it, it was proper for him to do so.[41]

Rosen cites to Dr. Mannen's 2019 and 2021 reports in his expert report.[42] He cites to the 2019 study to indicate that the RnP "by design, places a sleeping infant at a hazardous and dangerous incline," and to the 2021 study to show incidents of "decreased trunk movements and increased neck movements in infants using inclined sleepers, as well as increased spine flexion." Rosen also noted the study suggested these circumstances "make[] it more difficult for infants who fall into the

---

[38] D.I. 155 p.11.
[39] *Id.* p. 14.
[40] D.I. 190 p.13.
[41] D.I. 190 p.18-21.
[42] *Id.* Ex A. p.14-15.

9

chin-to-chest position to extricate themselves from it." In deposition testimony, Rosen notes he considered the measurements in Dr. Mannen's report of the infant's replicated position and angle incline at the time of death because no one measured the actual infant.[43] Rosen also testified that he "didn't need her report to reach [his] conclusions."[44]

An expert may "rely upon the records of another expert in formulating his opinion."[45] As noted above, Rosen uses Mannen's studies to inform his understanding of the RnP's mechanics, the safety of these mechanics, and how the mechanics impact an infant's position. It is proper for Rosen to consider the findings of a biomechanical expert in forming his medical causation opinion when a product defect is alleged to have caused an injury. Further, Rosen considers Mannen's materials in addition to other medical literature, studies, and his own knowledge and experience. Rosen's methodology did not solely depend on Dr. Mannen's work.

Rosen's expert report indicates he uses biomechanical conclusions in forming his opinion.[46] However, Rosen also relies on medical literature pertaining to infant sleep environments and SUIDS as well as his own experience and training. Rosen's methodology is consistent with that of a medical expert and not an engineering

---

[43] D.I. 155 Ex. C 114:6-24-116; D.I. 190 Ex. H 410:15-411:1-6.
[44] D.I. 190 Ex. H 411:11-13.
[45] *Stewart v. Dep't of Servs. For Child., Youth, and their Fams.*, 991 A.2d 750, 758 (Del. 2010)(citing *Michaels v. Gregory*, 2007 WL 2702811 (Del. 2007).
[46] D.I. 190 Ex. A p.11-16.

10

expert. Rosen is not purporting to give a biomechanical opinion. It is proper for Rosen to rely on biomechanical conclusions in forming his causation opinion on what caused the injury in this products liability case.

Defendants assert Rosen improperly relies on "anecdotal case reports" which do not consider "coincidence or other potential causes."[47] Plaintiffs respond by pointing out the "extensive citations to relevant medical research and articles supporting his opinions."[48] In his expert report, Rosen cites to a multitude of studies and medical literature to support his general causation opinion.[49] Case study research is not the only support he relies upon but is a "piece of the puzzle" that helps inform his opinion.[50]

Finally, Defendants argue Rosen's general causation opinions cannot be based on the AAP guidelines and recommendations because they are not "mandatory."[51] Plaintiffs respond that the guidelines are relevant to Rosen's opinion because they are "evidence-based" and align with "peer-reviewed medical and epidemiological research."[52]

The Court finds reliance on the AAP guidelines appropriate considering they are based upon peer-reviewed research and studies and the guidelines update with

[47] D.I. 155 p.15.
[48] D.I. 190 p.16.
[49] *See Id.* Ex. A p.7-13.
[50] *See* D.I. 155 Ex. B 401 14-24, 402:1-13.
[51] D.I. 155 p.15-16.
[52] D.I. 190 p.15.

11

the release of new studies.[53]  In his rebuttal report, Rosen responds to critiques of relying on AAP guidelines due to their lack of authority by stating the guidelines "reflect best practices and accepted standards of pediatric care."[54]  The AAP guidelines are relevant to Rosen's expert field, and therefore, appropriate for Rosen to rely on in forming his opinion.

### Specific Causation

Defendants first argue Rosen's specific causation theory is inadmissible because the amount of speculation Rosen must make as to what occurred between 2:00AM and 10:00AM requires a large "analytical gap" between the data available and Rosen's conclusion that A.M.B died in a chin-to-chest position.[55]  Plaintiffs respond with Rosen's testimony explaining his conclusion on A.M.B.'s position at death and his support for those conclusions.[56]

Rosen admits he must make an "educated speculation" in concluding on how A.M.B. got into the position she was in at her death.[57]  However, Rosen is not making unsupported assumptions.  Rosen testified that "the totality of the history . . . absolutely supports" the opinion that a chin-to-chest position caused A.M.B. to die

---

[53] *Id.*; *see* D.I. 190 Ex. C. ("The technical report of the safe sleep guidelines published in 2011 was based upon 356 scholarly articles; that of the 2016 guidelines was based upon 400 scholarly articles; and that of 2022 guidelines was based upon 538 scholarly articles.")

[54] *Id.* Ex. C.

[55] D.I. 155 p.17-21.

[56] D.I. 190 p. 21-24.

[57] D.I. 155 Ex. B

from positional asphyxiation.[58] Rosen considered that the positional changes A.M.B. was found in are "positional changes which are known to affect the upper airway patency," and that her condition when found was consistent with positional asphyxiation and not other causes.[59] Rosen also considered and rejected the theory that A.M.B. moved after she died.[60] Rosen bases his opinion on his knowledge of and training in infant sleeping and his experiences observing and interpreting sleep studies as well as relevant medical literature and studies.[61]

To bolster Rosen's opinion, Plaintiffs point to the deposition testimony of Defendants' experts, Steven Donn and Kimberly Collins, suggesting both experts agree "that a chin-to-chest position is an emergency and could result in death."[62] Defendants disagree with Plaintiffs' representation of their testimony on the chin-to-chest position.[63] In response to all of the *Daubert* Motion, Plaintiffs consistently signal this testimony to suggest Defendants' experts are on the same page with Plaintiffs' experts in terms of the danger of a chin-to-chest position. The jury deserves the opportunity to hear the expert testimony on this issue from both sides and then determine which experts should be afforded more weight.

---

[58] D.I. 190 Ex. H 268:23-24, 269:1.
[59] *Id.* Ex. H 268:6-20; 272-273:1-15.
[60] *Id.* Ex. H 269:20-24-270-271:1-2; 273:16-24; 274:12-24, 275-276:1-5.
[61] D.I. 155 Ex. C 118:15-19; Ex. A. p.17-18.
[62] *Id.* p. 24-26.
[63] D.I. 211 p.16-17.

Second, Defendants argue Rosen's opinion is inadmissible because he did not conduct a differential diagnosis. They further contend Rosen did not consider two prominent alternative causes of death: (1) lack of restraint use and (2) the presence of a blanket.[64] Plaintiffs counter that Rosen did consider and rule out other potential causes of death. To support this, Plaintiffs point to sections of Rosen's report and rebuttal as well as deposition testimony to show Rosen considered and ultimately determined there was no evidence indicating another diagnosis.[65] Rosen bases his finding that there was no other cause of death on the fact that A.M.B. was found "in a position which is known to put infants at risk and actual occlusion of their upper airway, and that when that happens, causes death and she died in that position."[66]

Differential diagnosis is a methodological process of exclusion recognized in clinical medicine "involv[ing] the testing of a falsifiable hypothesis . . . through an attempt to rule out alternative causes."[67] It is the Court's responsibility to determine if an expert uses a reliable differential diagnosis method to come to their conclusion.[68] Delaware law grants the courts flexibility in determining the reliability of an expert's differential diagnosis method.[69]

---

[64] D.I. 152 p.22-24.
[65] *See* D.I. 190, Ex. A p.2-4; 17-19; Ex. B. p.2-3; Ex. F 138:10-24, 139:1-16.
[66] *Id.* Ex. F 139:12-16.
[67] *State v. McMullen*, 900 A.2d 103, 116 (Del. Super. Ct. 2006)
[68] *Id.* at 117.
[69] *Id.* at 118.

14

Defendants cite to a footnote in *State v. McMullen* which lays out a two-step approach to differential diagnosis taken by the New Jersey Supreme Court.[70] Defendants seem to suggest that because Rosen did not take this formal approach to his analysis, his opinion is improper. However, case law does not require this approach, and the expert can use whatever reliable methodology to differential diagnostics they see fit. Although Rosen does not conduct an extensive analysis into other potential causes of death, Rosen does address them[71] and relies on his methodology and resources used to form his ultimate opinion and conclude that there is no medical cause other than positional asphyxiation that could have led to A.M.B.'s death. In addition, Rosen addressed both the lack of restraint and blanket-use concerns raised by Defendants and, using his experience, training, and reliable resources, ruled out each as a potential cause.[72]

Based on the above reasons, Defendants' Motion to Exclude the testimony of Dennis Rosen is **DENIED**.

## TESTIMONY OF ERIN MANNEN

Defendants ask the Court to exclude the testimony of Erin Mannen ("Mannen"), Plaintiffs' expert in biomechanical engineering. Mannen's ultimate opinion is that "the defective design of the Fisher Price Rock 'n Play Sleeper results

---

[70] *Id.* 116 n.63 (citing *Creanga v. Jardal*, 886 A.2d 633, 639 (2005)).
[71] *See* D.I. 190, Ex. B p.2-3, Ex. F 138:10-24, 139:1-16.
[72] *See Id.* Ex. F 139-42; 143-46.

15

in an unreasonably dangerous biomechanical scenario that negatively influences breathing, increasing the risk for positional asphyxia and/or suffocation, which is what occurred with [A.M.B.]."[73]   In addition, she opines that the RnP's design "promotes a flexed trunk and flexed head/neck position for babies in the supine position, positions known to compromise respiration which could lead to respiratory issues and/or positional asphyxiation" and that the design "facilitated [A.M.B] in obtaining a chin to chest and flexed trunk position . . . exacerbated by [A.M.B.] sliding down the inclined back of the [RnP]."[74]   Mannen relied on her prior studies[75] as well as other studies and medical literature[76] and facts and records of this case.[77]

Defendants base the need for exclusion on two main arguments: (1) Mannen cannot testify to medical causation because it is outside her area of expertise, and (2) Mannen's opinions are speculative and lack an evidentiary basis.[78]   Under the second basis, Defendants argue Mannen's hypotheses, including (a) the RnP made it easy for an infant to get into a dangerous "chin-to-chest" or "flexed head/neck" position, (b) the RnP increases an infant's risk for suffocation or positional asphyxiation by placing them in a "flexed trunk" position, and (c) 90-degree heat-turn/rebreathing theory, are not supported by evidence or reliable science.[79]   Defendants premise

---

[73] D.I. 193 Ex. E, Mannen's Expert Report, p.31.
[74] *Id.*
[75] *Id.* p.7-16.
[76] *Id.* p.32-34.
[77] *Id.* p.5.
[78] *See* D.I. 168.
[79] *Id.* p.21-23.

16

much of their opposition to these hypotheses with the argument that Mannen's studies, her own and others, are unreliable and inapplicable to A.M.B.'s death.

## Qualifications as a Biomechanical Expert

Defendants argue Mannen makes unqualified medical causation opinions based on an unreliable methodology.[80] Defendants assert Delaware case law supports the exclusion of Mannen's biomechanic opinions in this case. Plaintiffs respond that Mannen has not given any specific medical causation opinions and will not testify to any at trial.[81] Plaintiffs further argue that Delaware case law deems Mannen's biomechanic opinions admissible to show "the design of the [RnP] placed A.M.B in a dangerous position associated with positional asphyxia/suffocation."[82]

In *Eskin v. Carden*, the Delaware Supreme Court held biomechanical testimony is admissible when it "bridges the gap between the general forces at work in an accident determined by physical forces analysis (whether it be "physics" or engineering") and the specific injuries suffered by the particular person who was affected by those forces."[83] The Court states the necessary inquiry for a trial judge to determine the admissibility of specific biomechanical testimony is:

> whether the expert and the "field of expertise" itself can produce an opinion that is sufficiently informed, testable and in fact verifiable on an issue to be determined at trial. The trial judge must be satisfied that the generalized conclusions of the biomechanical expert are applicable

---

[80] D.I. 168 p.17-21.
[81] D.I. 193 p.17.
[82] *Id.* 18-22.
[83] *Eskin v. Carden*, 842 A.2d 1222, 1228 (Del. 2004).

to a particular individual. For example, did the expert consider the effect of pre-existing medical conditions and the unique susceptibility of a particular plaintiff to the injuries claimed? Does the "field" of biomechanical engineering adequately test for these highly individualized characteristics and document verifiable statistical results about which an expert within the field can render a trustworthy opinion in a particular case?

The *Eskin* Court did not allow in the specific biomechanical causation opinion at issue because the expert offered an opinion without considering the specific history of the party injured in the accident.[84] The expert did not review key portions of the record including the injured party's medical records and deposition nor did the expert inquire into details of the accident.[85] In *Mason v. Rizzi*, the Delaware Supreme Court further reinforced *Eskin*'s holding that generalized biomechanical opinions without inquisition into the distinct features of the case at hand are inadmissible. The Court in *Mason* found the opinion offered clashed with that holding because the biomechanical expert did not consider the injured party's medical history.[86]

The expert methods in these cases are in stark contrast to the method in which Mannen came to her conclusions. In her expert report, Mannen described how she used her "golden standard" methodology from her prior studies and applied it to the specific facts of A.M.B's case.[87] Mannen was able to observe and measure the RnP

---

[84] *Id.* at 1230.
[85] *Id.* at 1231.
[86] *Mason v. Rizzi*, 89 A.3d 32, 37 (Del. 2004).
[87] D.I. 193 Ex. E p.29.

in this case to evaluate it against the products used in her study.[88]  Mannen relied on the entire record of this case, including medical examiner reports and photos, police reports, and deposition testimony of those at the accident.[89]

Moreover, in *Lee v. Holbrook*, the Delaware Superior Court held a medical expert's reliance on the biomechanical expert's conclusions "reinforced the admissibility of [the biomechanical expert's] testimony."  Two of Plaintiffs' medical experts, Dr. Rosen and Dr. Hoffman, properly rely on Mannen's studies and report in forming their conclusions.

"[A] biomechanical engineer may testify regarding the forces created by an impact and the general effects on the human body caused by such forces.  The expert may not, however, testify regarding the cause of the plaintiff's particular medical problems."[90]  Mannen's causation opinions include (1) "the design of the [RnP] promotes a flex trunk and flex head neck position for babies in the supine position, positions known to compromise respiration which could lead to respiratory issues and/or positional asphyxia;[91]" (2) "the design of the [RnP] facilitated [A.M.B] in obtaining a chin to chest and flexed trunk position, which was exacerbated by [A.M.B] sliding down the inclined back of the [RnP];[92]" and (3) "the defective

---

[88] D.I. 193 Ex. E p.17.
[89] D.I. 193 Ex. E p.5.
[90] *Kelly v. McHaddon*, 2001 WL 209858 at *2 (Del. Super. Jan. 24, 2001).
[91] *Id.* Ex. E p. 25-27, 31.
[92] *Id.* Ex. E p.31.

design of the [RnP] resulted in an unreasonably dangerous biomechanical scenario that negatively influences breathing, increasing the risk for positional asphyxia and/or suffocation, which is what occurred with A.M.B."[93]

Defendants raise concern with the following opinions in Mannen's report: the design of the RnP (i) "resulted in a dangerous biomechanical position that can cause positional asphyxiation and/or suffocation, as happened with [A.M.B];[94]" (ii) results in "a flexed-trunk posture similar to the posture of the infants in the inclined sleep products in my study [which] puts infants at higher demand to maintain pulmonary function, leading to an increased risk for suffocation;[95]" and (ii) "makes it easier for babies to obtain the dangerous chin-to-chest position,[96]" or the "flexed/head neck position,[97]" "positions known to compromise respiration which could lead to respiratory issues and/or positional asphyxia.[98]" Defendants argue Mannen is not qualified to give these opinions because they are medical causation opinions. The Court disagrees. Mannen's opinions do not opine to the medical cause of A.M.B.'s injury. Mannen's opinions, based on her own and other accepted studies, conclude that A.M.B. faced these increased respiratory risks due to the design of the RnP.

---

[93] *Id.*
[94] D.I. 168 Ex. I p.3.
[95] *Id.* Ex. I p.11.
[96] *Id.* Ex. I p.10.
[97] *Id.* Ex. I p.31.
[98] *Id.*

Mannen's specific causation opinions assist the jury in "bridg[ing] the gap between the general forces at work in [the] accident" and "the specific injuries suffered" by A.M.B.[99]  Mannen maintains she will not give medical opinion testimony, and her report does not exceed her scope of expertise.  However, the Court notes if Mannen's trial testimony crosses the line into medical opinion, this order does not preclude Defendants from objecting.

## Causation Opinions

### A. Impact on Infant Head/Neck and Trunk Movement

Defendants contend Mannen's opinion that the design of the RnP made it easier for A.M.B to get into a "dangerous chin-to-chest" or "flexed head/neck" position due to the design putting A.M.B. in a "flexed trunk" position is speculation. Defendants find Mannen's use of her CPSC studies unreliable because the *Wang* 2021 article states the authors "*speculate* that this flexed-trunk body position which renders additional trunk movement difficult, *might* explain the incidence of infants found in a chin-to-chest position as note in some incident reports (Consumer Product Safety Commission, 2019)."[100]  Plaintiffs respond to this concern by pointing to Mannen's deposition testimony explaining she uses terms like "speculate" and "may" because, in her area of expertise, they mean "we're interpreting that data that

---

[99] *See Eskin*, 842 A.2d at 1228.
[100] D.I. 168 p.23.

21

. . . obtained through this well thought-out, well-designed research study and interpreting in the context of other published research."[101]  She further explains using words like "prove" is a "very strong word to use in science" and is not typically used.[102]

It is clear Mannen used the methodology from her CPSC study and applied it to this case by testing and measuring the RnP at issue and incorporating the case specific facts to her analysis.  Mannen's studies used "gold standard" methods as well as "common experimental techniques . . . used in peer-reviewed research on infants since the 1980s."  In addition, Mannen conducted measurement techniques described in ASTM F3118-17a:Standard Consumer Safety Specification for Infant Inclined Sleep Products.  Mannen's specific methods, used in this case, were peer-reviewed and published.[103]  Mannen's CPSC study and subsequent peer-reviewed publications are relevant and reliable sources for Mannen to depend on in forming her expert opinions in this case.

In the CPSC Study and subsequent publications, Mannen and her team administered *in vivo* experimental testing "to evaluate the impact of an incline crib mattress and inclined sleep products on an infant's ability to move and use their muscles to achieve movement…"[104]  The study found "the incline makes it easier

---

[101] D.I. 193 Ex. H 15-16.
[102] *Id.* Ex. H 22.
[103] D.I. 193 Ex. E p.16.
[104] *Id.* p.24.

for babies to lift and move their heads."[105]  Expanding on these findings, Mannen's later publications discovered a supine-positioned infant in an inclined sleep product impacts trunk movement and flexion so that the infant cannot correct neck movements if their head moves forward, which is a position that can cause positional asphyxiation.[106]  Mannen cites to other peer-reviewed studies to demonstrate that the "changes in trunk posture impact pulmonary and respiratory function."[107]

The Court finds it proper that Mannen utilized her prior study and publications in application to this specific case and to form her chin-to-chest opinion.  Mannen did not rely on speculation nor "analytical gaps" in coming to this conclusion. Specific criticisms of her methodology and application of it to this case go to the weight of Mannen's testimony and are appropriate for cross-examination.

## B. Trunk Flexion Causing an Increased Risk of Positional Asphyxia and/or Suffocation

Mannen relied on her CPSC study as well as other studies in forming her opinion that A.M.B.'s trunk flexion created an increased risk of positional asphyxiation and/or suffocation.  The Reiterer study supports Mannen's testimony that "head flexion of just 45° can and does significantly impair a baby's ability to breathe" and that "the intended posture" of the RnP "has negative implications for breathing."[108]

---

[105] *Id.*
[106] *Id.* p.25-27.
[107] *Id.* p.25.
[108] D.I. 193 Ex. E p.25, 27.

23

Mannen also cites to several other studies, including Hauck, Kemp, and Thach, to support her position that if an infant's ability to move is implicated it "could contribute to the increased risk of suffocation if a baby struggles to move into a safe breathing position."[109]  In her deposition testimony, Mannen states, in addition to these studies, she relies on her "experience and [her] expertise and the AAP guidelines, [her] training, and [her] team collaborations with pediatric pulmonologists, and what [she] understand[s] to be well-recognized position for infants to avoid is a chin-to-chest position."[110]

Defendants take issue with Mannen's 2019 CPSC study finding normal oxygen saturation levels with infants in the supine lying position.[111]  However, not only did Mannen expect that outcome for the short duration of the study's test trials, but she relied on the neck and trunk movement findings, and not the oxygenation results, in forming her opinion for this case.[112]  In addition, Mannen noted the CPSC study "with the context of the larger medical literature" gave her ample understanding of infant breathing.[113]

Defendants have multiple criticisms of Mannen's study, and the other studies Mannen cited to in her report, specifically that one study Mannen relied on used

---

[109] *Id.* Ex. E p.13.
[110] *Id.* Ex. J 398:20-25.
[111] D.I. 168 p. 28.
[112] *Id.* p. 34; Ex. J 204:6-11.
[113] *Id.* Ex. J 206:6-10.

24

adult subjects rather than infants and that Mannen did not rely on a study that isolated the "flexed trunk" factor to look at it alone. These criticisms do not render Mannen's testimony inadmissible and, instead, go to the weight rather than the admissibility. These critiques are best addressed through cross-examination.

## C. 90-Degree Head Turn/Rebreathing

In response to Defendants' arguments against Mannen's 90-degree head-turn/rebreathing theory, Plaintiffs state "there will no medical testimony in the Bertola case opining that rebreathing was a cause of A.M.B.'s death and, consequently, Dr. Mannen will offer no specific causation testimony on this issue."[114] In light of Plaintiffs' concession, Defendants' Motion on this point is **GRANTED**.

Based on the above reasons, Defendants' Motion to Exclude the Testimony of Erin Mannen is **DENIED**.

## TESTIMONY OF BENJAMIN HOFFMAN

Defendants seek to exclude the testimony of Plaintiffs' pediatric expert, Dr. Benjamin Hoffman ("Hoffman"). Hoffman is a pediatrician and an expert in child injury prevention.[115] Hoffman's ultimate opinion is the RnP "placed an infant in a position for sleep which was inconsistent with the clear recommendations of the

---

[114] D.I. 193 p.39.
[115] D.I. 195 p.1.

25

AAP," and A.M.B "died of positional asphyxiation while in a [RnP] as a result of the inclined position in which it placed her, causing her head to flex downward at the neck, leaving her in a 'chin to shoulder' position, obstructing her airway, leading to positional asphyxia."[116] In forming this conclusion, Hoffman reviewed A.M.B.'s prenatal, delivery, post-partum, and pediatric care medical records, case records pertaining to the incident, and medical studies and literature.[117]

Defendants argue three primary contentions with Hoffman's testimony: (1) Hoffman is not a biomechanical expert, yet he gives biomechanic opinions; (2) Hoffman's general causation opinion has no reliable basis in science and his reliance on Mannen's report deems his opinion inadmissible, and (3) Hoffman's specific causation theory is inadmissible because it is speculative and does not consider a differential diagnosis analysis.[118]

**Hoffman's Qualifications**

Defendants argue Hoffman offers explicitly biomechanic opinions that should be excluded. Specifically, Defendants refer to his opinions that A.M.B.'s death "was the result of biomechanical alterations manifested when positioned supine for sleep at an angle of approximately 30 degrees from the horizontal,[119]" that "[t]hese biomechanical alterations led to [A.M.B.] experiencing positional asphyxiation and

---

[116] *Id.* Ex. B p.2, 14.
[117] *Id.* p.2.
[118] *See* D.I. 167.
[119] *Id.* Ex. B p.2.

airway obstruction due to chin to shoulder positioning,[120]" and that A.M.B. "died of positional asphyxiation while sleeping in an [RnP] as a result of the inclined position in which it placed her, causing her head to flex downward at the neck, leaving her in a 'chin to shoulder' position, obstructing her airway, leading to positional asphyxia."[121]

Hoffman concedes to not have the expertise of a biomechanical engineer. However, he stated in deposition testimony that he has "an understanding of biomechanics as it applies to children and the practice and science of pediatrics and child health and disease."[122] He further states "pediatricians employ principles of biomechanics in normal practice."[123] Hoffman described his methodology in coming to these opinions as the following:

> To form my opinions in this matter, I reviewed all available medical records from birth for Alice Bertola, including birth, pediatric care, and post-mortem examination. I also reviewed the literature regarding the impact of incline on infant biomechanics.

> In considering alternative diagnoses or explanations for Alice Bertola's death, I employed a systematic approach utilizing the facts of the case, medical history, and post-mortem examination. Utilizing hypothetical-deductive reasoning, I considered a differential diagnosis by system, to determine the relative likelihood of potential causes of death . . .

---

[120] *Id.*
[121] *Id.* Ex. B p.14.
[122] D.I. 195 Ex E. 23:16-22.
[123] *Id.* Ex E. 23:23-24:1.

> The approach described above is the same approach that I would take when considering a diagnosis or a cause of death in my clinical practice.[124]

Throughout his analysis, Hoffman used his personal knowledge, training, and experience and reviewed AAP guidelines for safe sleep, peer-reviewed publications covering the link between sleep environment and SUIDS, and the records specific to this case.[125] In addition, Hoffman conducted a differential diagnosis, a method commonly used by medical experts.

Hoffman's opinions are rooted in his pediatric expertise. He uses "technical" terms such as "biomechanical alteration" to offer more precise conclusions. Just because he uses these terms does not mean he is offering a biomechanical opinion. The Court does not find Hoffman's opinions exceed the scope of his expertise.

**General and Specific Causation**

Defendants first raise contention with Hoffman's reliance on Mannen arguing her studies and report are themselves unreliable and do not support Hoffman's opinions. However, as stated above, the Court finds Mannen's CPSC study, subsequent articles, and report to be reliable and relevant sources. The question then turns to whether Hoffman can rely on these sources to support his opinion.

---

[124] *Id.* Exs. B, D.
[125] D.I. 195 p.13-15.

28

Delaware case law holds "it is settled that an expert witness may rely upon the records of another expert in formulating his own opinion."[126]  As discussed above, the Court finds Mannen's CPSC study and peer-reviewed publications to be reliable and relevant sources.  Therefore, the Court finds it appropriate for Hoffman to have used them in his analysis for this case.  Defendants discuss their contentions with Mannen's study and articles, which the Court addressed above, and still holds that they do not go to the admissibility of the testimony but rather the weight and should be handled at cross-examination.

Hoffman relies on sources other than Mannen's materials to come to his conclusions.  Hoffman noted in his deposition testimony that without Mannen's work he "would not be able to understand the subtle biomechanical differences" and "would be going simply with what [he] know[s]" about gravity, inclines, and babies.[127]  Thus, indicating that he does not need to rely on Mannen to come to his ultimate conclusions but does need her work to understand "subtle biomechanical differences," which is understandable considering Hoffman is not a biomechanical expert.  He states outside of Mannen's work, he relied on his

> experience of years as a practicing pediatrician, including taking care of scores of newborns, [his] experience of 25 years as a Child Passenger Safety Technician putting thousands, helping fit thousands of kids into car safety car seats, and honestly, just common sense, because if you told somebody a baby was sitting in something with an incline, tell a

---

[126] Stewart, 991 A.2d at 758.
[127] D.I. 195 Ex. E 295:6-11.

pediatrician a baby is sitting in something with an incline and they were found with their chin to their chest, any reasonable pediatrician, I believe, would say, yeah, I understand how that happened.[128]

Defendants' contention that Hoffman cannot rely on AAP guidelines and recommendations to form his causation opinions is misguided. As discussed above, the AAP guidelines are based on hundreds of medical studies and update as new research is published. Because the guidelines are not mandatory does not mean they hold no value. Further, Hoffman relies on more than just AAP guidelines.

Defendants' position that Hoffman's opinion is wholly unreliable because he did not "inspect, test, or measure the [RnP] at issue in this case" is not sufficient to deem his testimony inadmissible. In addition, Defendants' contention that Hoffman's chin-to-chest opinion is unreliable because he does not know the position A.M.B was in when she died is not grounds for inadmissibility. Hoffman's report states that the position A.M.B was found in is a position consistent with "obstruct[ing] A.M.B.'s airway, leading to positional asphyxiation."[129] Hoffman's experience and training as a pediatrician gives him the expertise to understand and comment on A.M.B.'s position when her mother found her. Defendants' criticisms of this finding are best left for cross-examination.

---

[128] D.I. 195 Ex. E 295:20-296:1-8.
[129] D.I. 195 Ex. B p. 12.

30

In their Motion for Reargument, Defendants raise the argument that Hoffman's opinion that the RnP's "less-than 30-degree" incline can cause an infant to fall into the chin-to-chest position is unreliable because a published, peer-reviewed article Hoffman was a co-author to states "a semireclined angle of approximately 45 degrees, which enables the infant's head to lie against the back of the CSS [*i.e.*, car safety seat]."[130]   While the argument is untimely because Defendants failed to raise it in their briefing for the *Daubert* Motion, it nonetheless fails.   Hoffman cites the article in his report, not as a source he relied on to form his opinions, but under an appendix listing publications he authored in the past ten years.[131]  The article did not report test results of the impacts of infant inclined sleep products or another topic relevant to Hoffman's opinions in this litigation.   Its purpose was to "compare[] the effectiveness of hands-on and online education in improving and retaining child passenger safety (CPS) knowledge and skills among pediatric trainees."[132]  Defendants' argument is again one going to weight and not credibility and should be left for cross-examination.

## Differential Diagnosis

Defendants' final contention with Hoffman is that he did not conduct a "genuine differential diagnosis."[133]  As mentioned prior, differential diagnosis is a

---

[130] D.I. 244 p.7.
[131] D.I. 195 Ex. B p.19, Appendix A.
[132] *Id.* Ex. B.
[133] D.I. 167 p.21.

31

method commonly used in medical fields to rule out other potential causes of injury and/or death. The Court has flexibility in determining whether an expert used a reliable differential diagnosis method.[134]

The Court finds Hoffman conducted a sufficient differential diagnosis to deem his opinions admissible. In his report, Hoffman stated "in considering alternative diagnoses or explanations, [he] employed a systematic approach utilizing the facts of the case, medical history, and post-mortem examination," and "utiliz[ed] hypothetical-deductive reasoning, [to construct] a differential diagnosis by systems."[135] In his analysis, Hoffman observed the following systems: (1) fluid, electrolytes, and nutrition, (2) respiratory, (3) cardiovascular, (4) gastrointestinal, (5) endocrine, (6) neurologic, (7) hematologic, (8) infectious, (9) toxicologic/exposure, and (10) trauma.[136] The Court does not see how this differential diagnosis method could be found unreliable because Hoffman conducts a widespread evaluation of potential systems that could impact A.M.B.'s death and rules out the presence of indicators that those systems were at issue during the incident. Additionally, Hoffman explained why he ruled out both blanket use and lack of restraint use as causes of A.M.B.'s death.[137]

---

[134] *See McMullen*, 900 A.2d at 116-18.
[135] D.I. 195 Ex. B p.13.
[136] *Id.* Ex. B p.13-14.
[137] *Id.* Ex. D p.2,4.

Based on the above reasons, the Court finds that Benjamin Hoffman's testimony is admissible and, therefore, **DENIES**, Defendants' Motion.

**TESTIMONY OF DARLENE VASBINDER-CALHOUN**

Defendants request the Court to exclude the testimony of Plaintiffs' neonatal expert, Dr. Vasbinder-Calhoun ("Vasbinder-Calhoun"). Vasbinder-Calhoun's opinion is that the position A.M.B. was found in the morning is "consistent with positional asphyxiation and suffocation due to the incline angle to the RnP," and that A.M.B. suffered conscious pain and suffering while suffocating in the RnP.[138] In forming her opinion, she reviewed A.M.B.'s medical history, prenatal, delivery, and post-birth, the facts of the incident, and medical literature.[139]

Defendants contest Vasbinder-Calhoun's testimony on three grounds: (1) Vasbinder-Calhoun's general causation opinion that the RnP's incline can cause chin-to-chest positional asphyxiation lacks a scientifically reliable basis; (2) her specific causation opinion is speculative, unreliable, and lacks a differential diagnosis analysis; and (3) Vasbinder-Calhoun's testimony as to A.M.B.'s conscious pain and suffering is not rooted in science and was "invented for purposes of this litigation."[140]

---

[138] D.I. 189, Ex. A p.19-20.
[139] *Id.*, Ex. A, Attachment B – Listing of Documents Review.
[140] *See* D.I. 146.

33

## Causation Opinions

A general causation opinion goes to "whether a [product] is capable of causing a particular injury or condition in the general population," and a specific causation opinion suggests "whether a [product] caused a particular individual's injury."[141] The Court finds that Vasbinder-Calhoun cannot testify to her general causation opinion that the RnP "can cause death." Rather than using her personal experience, training, and knowledge in neonatology to reach this conclusion, Vasbinder-Calhoun uses her report to reiterate the findings of others. She discusses AAP Guidelines,[142] multiple studies, including Mannen's CPSC study, and their findings,[143] the RnP's recall history,[144] and Fisher-Price's internal communications,[145] but simply restates the content of those sources. Vasbinder-Calhoun's neonatal treatment experience includes the following conditions: apnea of prematurity, gastroesophageal reflux disease, atrial septal defects, sepsis, bradycardia, desaturation events, and neonatal pain.[146] While she does have extensive practice and understanding in treating these medical conditions in premature and newborn infants, her experience as a neonatologist has not exposed her to the knowledge and training in infant sleep

---

[141] *Smith v. Benjamin Moore & Co.*, 2012 WL 2914219 at *2 (Del. Super. Ct. July 18, 2012)(quoting *Merrel Dow. Pharms, Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997)).

[142] D.I. 289 Ex. A p.6-7, 15.

[143] *Id.* Ex. A p.13.

[144] *Id.* Ex. A p.10-11.

[145] *Id.* Ex. A p.8-9

[146] D.I. 189 p.4.

product design necessary to give a general causation opinion that the RnP can cause death.

On the other hand, Vasbinder-Calhoun employs and relies upon her expertise in forming her specific causation opinion. To conclude that the RnP caused A.M.B's death, Vasbinder-Calhoun conducted a differential diagnosis ruling out the alternative causes. Defendants raise several contentions regarding Vasbinder-Calhoun's differential diagnosis: (1) offers no "reliable scientific basis for excluding the medical examiner's rulings that the infant's cause of death was 'Sudden Unexplained Infant Death' and her manner of death was 'Could Not Be Determined:'" and fails to discuss (2) non-use of the RnP's restraint system; (3) impact of A.M.B.'s congestion before and during the incident; and (4) use of a blanket.[147]

An expert's testimony "should not be excluded because [they] failed to rule out every possible alternative cause of a plaintiff's illness," and "the alternative causes suggested by a defendant affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony."[148] Vasbinder-Calhoun's report acknowledged and ruled out numerous alternative causes including, congestion and parainfluenza;[149] impacts of underlying medical

---

[147] D.I. 146 p.19-20.
[148] *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999).
[149] D.I. 189 Ex. A p. 14-15.

conditions;[150] developmental issues;[151] diagnosis of failure to thrive[152]; up-to-date immunization;[153] and evidence of trauma, infection, or toxins, indicating SIDS.[154] She also discusses blanket use and lack of restraint use.[155]

Vasbinder-Calhoun states the position A.M.B. was found in is "consistent with positional asphyxia and suffocation due to the incline angle of the [RnP] as the cause of [A.M.B.'s] death."[156] Defendants find this testimony to be a "mere association" that A.M.B. died in the position she was found in and, therefore, deem it to be an unreliable finding by Vasbinder-Calhoun. Considering Vasbinder-Calhoun's expert knowledge of the treatment and diagnosis of medical conditions in infants as well as her review of Mannen's report and other medical literature on unsafe sleep environments in SUID cases, Vasbinder-Calhoun's opinion that A.M.B. died in the position she was found in is a relevant and reliable opinion. This argument is consistent among Defendants' Motions, and the Court finds that it is a weight argument appropriate for cross-examination, especially due to the parties' dispute over what position A.M.B. was actually found in.[157]

---

[150] *Id.* Ex. A p.19.
[151] *Id.*
[152] *Id.* Ex. C p.10-11.
[153] *Id.* Ex. C p.11.
[154] *Id.* Ex. A p.11-12.
[155] *Id.* Ex. A p.7, 16.
[156] D.I. 146 Ex. C p.19.
[157] *See Id.* p.17 fn.6.

**Conscious Pain and Suffering**

The Court already denied the exclusion of conscious pain and suffering testimony. Within that order, the Court accepted Vasbinder-Calhoun's testimony as to conscious pain and suffering to be admissible.

For the above reasons, Defendants' Motion to Exclude the Testimony of Darlene Vasbinder-Calhoun is **GRANTED** as it pertains to Vasbinder-Calhoun's general causation opinion that the RnP "can cause death," and is **DENIED** on all other grounds.

## TESTIMONY OF WAYNE ROSS

Defendants ask the Court to exclude the testimony of Plaintiffs' forensic pathology expert, Wayne Ross ("Ross"). Ross concludes the cause of death was "Complication of Positional Asphyxiation."[158] Ross also opines that A.M.B. "suffered conscious pain and suffering for a quantifiable period of time that would have been a minimum of a minute and a maximum of many minutes."[159] Ross relied on A.M.B's and Ms. Bertola's medical records, autopsy report, and records indicating the facts of the incident in coming to his conclusion.[160]

Defendants argue Ross's testimony is inadmissible because (1) he lacks a scientific basis for his general causation opinion that the RnP incline can cause chin-

---

[158] D.I. 191 Ex. C p.4 ¶1.
[159] *Id.* Ex. C p. 4 ¶4.
[160] *Id.* Ex. C p.1.

to-chest positional asphyxiation; (2) Ross's specific causation opinion is based on his own speculation and conjecture of the facts; (3) his opinion as to the pathological cause of A.M.B.'s death is only based on his own knowledge and not on other medical literature; and (4) his conscious pain and suffering opinions are "invented for the purposes of this litigation," and not based on a reliable scientific foundation.[161]

## Causation Opinions

Defendants argue Ross does not have the proper qualifications to make his opinions and that his opinions are not rooted in a scientifically reliable basis. Ross has sufficient experience conducting infant autopsies, and, within those cases, he has dealt with deaths by various kinds of asphyxia, including positional asphyxia.[162] In addition, Ross "routinely look[s] at the biomechanics and kinematics" in reconstructing infant deaths, as he did in this case.[163] The biomechanical aspect of Ross's experience has exposed him to inclination angles in asphyxiation cases.[164] In this case, Ross conducted the following analysis:

> I did an injury causation analysis which is a biomechanical analysis, and to that end I did a kinematic analysis where I looked at the head and neck complex, the torso, and the legs and reconstructed by way of a forensic analysis, which includes a biomechanical analysis, the kinematics of movement, which I've outlined here; and when I discussed her position and how she ultimately became the slouched

---

[161] *See* D.I. 148.
[162] D.I. 191 p.11-12.
[163] *Id.* Ex. D 196:17-197:1-8; Ex. F 448:15-449:7.
[164] D.I. 191 Ex. D 86:6-19, 87:14-89:4, 89:18-20.

position and the reconfiguration that occurred, that is the part and parcel of the biomechanical analysis that led to positional asphyxia. I went through that sort of thing and draw conclusions as I've outlined in this case.[165]

Ross's methodology to determine cause of death includes "well-established methods" in the forensic pathology field. His methods involved "recreat[ing] the scientific chain of events that caused [the] death by utilizing various scientific techniques, including the examination of the body through an autopsy, reconstruction of the death scene, consideration of laboratory test results and microscopic slides and studies, analysis of medical history, [and] application of kinematics and biomechanics,"[166]

In coming to his conclusion that A.M.B. suffered a chin-to-chest asphyxiation, Ross considered the position Ms. Bertola found A.M.B in, photographs of A.M.B. at the scene and autopsy photographs showing her positioning and swelling of her brain, microscopic slide analysis indicating petechial hemorrhages, and a lack of congenital abnormalities, toxicology finds, or infectious diseases.[167] Ross confirmed each of these indicators are consistent with chin-to-chest positional asphyxiation.

Defendants contend Ross's opinion is unreliable because he did not cite scientific literature in his opening report and take issue with multiple medical

---

[165] *Id.* Ex. D 196:17-197:8.
[166] *Id.* p.6; Ex. C p.2.
[167] *Id.* p.7.

literature sources Ross later cited.[168]  While supporting medical literature boosts the reliability of an expert's opinion, it is not required so long as the opinion is supported by "good grounds."  Considering Ross's extensive background in forensic pathology and the acceptance of his methodology, his opinions pass muster without the need for additional support from medical literature.  In addition, Defendants' criticisms of the literature Ross later cited to goes to weight, not admissibility, and should be raised at cross-examination.

Defendants also contend Ross's opinion is dependent on the "mere association" that A.M.B. died in the position she was found in.  However, Ross considered the totality of the record and applied his knowledge of causes of infant death and incident reconstruction to form his conclusion that A.M.B. died in that position.

The Court finds Ross's experience, training, and knowledge in forensic pathology as well as his recognized methods make him a reliable and relevant expert. His application of those methods and his expertise to the facts and circumstances of A.M.B.'s death is sufficient to admit his testimony.

---

[168] D.I. 148 p.21-25.

**Conscious Pain and Suffering**

The Court already denied the exclusion of conscious pain and suffering testimony. Within that order, the Court accepted Ross's testimony as to conscious pain and suffering to be admissible.

For these reasons, the Court **DENIES** Defendants' Motion to Exclude the testimony of Wayne Ross.

**IT IS SO ORDERED.**

*/s/ Francis J. Jones, Jr.*
Francis J. Jones, Jr., Judge

cc: *File&ServeXpress*
   Robert J. Leoni, Esq.
   Alan M. Feldman, Esq.
   Daniel J. Mann, Esq.
   Edward S. Goldis, Esq.
   Jennifer C. Wasson, Esq.
   Ryan D. Kingshill, Esq.
   Amy Furness, Esq.
   Robert Shannon, Esq.